SALE AND PURCHASE AGREEMENT

between

**ROBERT L. GELTZER, ESQ.,
AS CHAPTER 7 TRUSTEE OF DOUBLEDOWN MEDIA LLC,**

as "Seller"

and

**DEALFLOW MEDIA ACQUISITION, INC.**

as "Purchaser"

Date: As of January 22, 2010

# SALE AND PURCHASE AGREEMENT

THIS AGREEMENT (this "**Agreement**") is made as of January 22, 2010 (the "**Effective Date**") by and between ROBERT L. GELTZER, AS CHAPTER 7 TRUSTEE OF DOUBLEDOWN MEDIA LLC, with an office at Law Office of Robert L. Geltzer, 1556 Third Avenue, Suite 505, New York, New York 10128 ("**Seller**"), and DealFlow Media Acquisition, Inc. a corporation with a principal place of business at 88 Froehlich Farm Blvd., Suite 206 Woodbury, NY 11797 ("**Purchaser**").

**W I T N E S S E T H:**

WHEREAS, Doubledown Media LLC ("**Debtor**") is a debtor in the Chapter 7 bankruptcy case (the "**Bankruptcy Case**") styled In Doubledown Media LLC, Case No. 09-10857(SMB) before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and

WHEREAS, Seller is the Chapter 7 Trustee of the Debtor in the Bankruptcy Case, having been appointed as such Trustee on February 25, 2009 by the office of the United States Trustee; and

WHEREAS, Seller, as Chapter 7 Trustee of the Debtor, is the owner of magazine publications, together with all of Seller's right, title, and interest, in the following assets (hereinafter referred to as the "**Assets**"):

(i) Global rights to publish and usage of all of the Seller's names and all trademarks and all copyrights,
(ii) Database of all of Seller's subscribers,
(iii) All of Seller's domain registrations,
(iv) Existing inventory of all back issues of Seller's magazines and all online content,
(v) Right to license to third parties all of Seller's publishing rights,
(vi) All of Seller's advertiser contact information (electronic and physical lists), and to the extent located by the Seller and if available, advertiser signed contracts/insertion orders and history of accounts payable files,
(vii) To the extent located by Seller, all media kits and all design files.

Notwithstanding anything in the foregoing to the contrary, the term Assets shall not include: (i) any of Seller's right, title, and interest, if any, in and to any accounts receivable of the Debtor's estate or otherwise; and (ii) any rights to publish and usage of names and trademarks and copyrights relating solely to PrivateAir; and

WHEREAS, Seller desires to sell and convey to Purchaser, pursuant to Section 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Purchaser desires to purchase, all of Seller's right, title and interest in and to the Assets, upon the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

# ARTICLE I.

## DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings indicated:

1.01 "**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with the specified Person. For purposes of this definition, the term "controls" (including, with correlative meanings, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting stock, by contract or otherwise.

1.02 "**Approval Motion**" has the meaning given in Section 6.03(b).

1.03 "**Assets**" has the meaning given in the preamble of this Agreement.

1.04 "**Auctioneer**" has the meaning given in Section 9.01.

1.05 "**Bankruptcy Case**" has the meaning given in the Preamble of this Agreement.

1.06 "**Bankruptcy Code**" has the meaning given in the Preamble of this Agreement.

1.07 "**Bankruptcy Court**" has the meaning given in the Preamble of this Agreement.

1.08 "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

1.09 "**Business Day**" means any day other than a Saturday, Sunday or day on which the banks in New York, New York are authorized or obligated by law to be closed.

1.10 "**Cash Balance**" has the meaning given in Section 2.01(a)(ii).

1.11 "**Closing**" has the meaning given in Section 4.01.

1.12 "**Closing Date**" has the meaning given in Section 4.01.

1.13 "**Debtor**" has the meaning given in the Preamble of this Agreement.

1.14 "**Default**" has the meaning given in Section 11.03.

1.15    "**Deposit**" has the meaning given in Section 2.01(a)(i).

1.16    "**Dollars**" or "**$**" means lawful currency of the United States of America, and all sums payable by either party to the other pursuant to this Agreement shall be paid in Dollars.

1.17    "**Embargoed Person**" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder.

1.18    "**Final Order**:  means an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for re-argument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for re-argument or rehearing, shall then be pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing, and in the event that an appeal, writ of certiorari, or re-argument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been upheld or affirmed by the highest court to which such order was appealed, or certiorari, re-argument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for re-argument or rehearing shall have expired; provided, however, the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.19    "**Governmental Authority**" means the United States, the State of New York and the City of New York and any political subdivision, agency, authority, department, court, commission, board, bureau or instrumentality of any of the foregoing asserting jurisdiction over any of the parties hereto or over the Assets.

1.20    "**OFAC**" means the Office of Foreign Assets Control, Department of the Treasury.

1.21    "**Person**" means an individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or subdivision thereof.

1.22    "**Purchase Price**" has the meaning given in Section 2.01.

1.23    "**Sale Order**" has the meaning given in Section 6.03(b).

## ARTICLE II.

## PURCHASE PRICE; PURCHASE AND SALE

2.01 **Payment of Purchase Price; Earnest Money.**

(a) The purchase price (the "**Purchase Price**") for the Assets is $55,000 payable by Purchaser as follows:

(i) Upon execution of this Agreement, Purchaser shall pay to Seller a deposit in the amount of twenty percent (20%) of the Purchase Price (such amount, together with any interest earned thereon, is herein referred to as the "**Deposit**") by delivering to Seller a bank check payable to "Robert L. Geltzer, as Chapter 7 Trustee", in the amount of $11,000 representing twenty percent (20%) of the Purchase Price.

(ii) $44,000 (the "**Cash Balance**") at the Closing, to be paid by Purchaser to Seller pursuant to the provisions of Section 2.01(b) below.

(b) The Cash Balance, shall be paid at Closing by wire transfer of immediately available federal funds transferred to one or more bank accounts designated by Seller or by bank check payable as set forth in Section 2.01(a)(i), provided that Seller shall have the right, to be exercised by written notice given to Purchaser at least one (1) Business Day prior to the Closing, to require Purchaser to pay all or a portion of the Cash Balance by one or more separate official bank checks, each to be drawn on the New York office of a member bank of the New York Clearinghouse Association, and each to be payable to the unendorsed order of Seller or Seller's designee. If Seller elects to cause Purchaser to pay all or a portion of the Cash Balance by official bank check(s) as aforesaid, then Seller's exercise notice shall set forth (i) the portion of the Cash Balance to be so paid, (ii) the number of official bank checks to be drawn and (iii) the payee(s) thereof. With respect to the portion of the Cash Balance to be paid by wire transfer, if any, Seller, at least one (1) Business Day prior to the Closing, shall notify Purchaser in writing of the designated bank account(s) and the wiring instructions therefor.

2.02 **Deposit.**

(a) The Deposit shall be delivered to Seller in accordance with the provisions of Section 2.01 hereof, and shall be held by Seller in an interest-bearing account until the Closing or sooner termination of this Agreement. In the event that the Closing does not occur, the Deposit shall be disbursed as provided in this Agreement. Any interest earned on the Deposit shall be paid to the same party entitled to the Deposit hereunder (as and when such party is entitled to the Deposit), and the party receiving such interest shall be liable for any income taxes thereon.

(b) If a dispute arises between Seller and Purchaser with regard to the disposition of the Deposit, then Seller shall, either (i) continue to hold the Deposit and the interest thereon, if any, until otherwise directed by a final judgment of the Bankruptcy Court

directing the disposition of the Deposit or (ii) deposit the Deposit and the interest thereon with the Clerk of the Bankruptcy Court. Seller shall give written notice of such deposit to Purchaser.

(c) If the Closing occurs, Purchaser shall receive a credit against the Purchase Price in the amount of the Deposit, provided, however, any interest earned on the Deposit shall not be credited against the Cash Balance. Seller shall not be liable for any losses suffered in connection with any such investment and shall have no obligation to obtain the best, or otherwise seek to maximize, the rate of interest earned on any such investment. Any fees or charges in connection with such investment shall be paid out of the Deposit before any other payments shall be required to be made from such amounts.

2.03 **Purchase and Sale.** Subject to the terms and conditions of this Agreement, Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Assets, for the consideration and upon and subject to the terms, provisions and conditions hereinafter set forth. This sale is a final sale and not subject to higher or better offers and the sale order shall so provide.

## ARTICLE III.

## CONDITION OF ASSETS

3.01 **Condition of Assets.** Purchaser is a sophisticated investor and its valuation of, and decision to purchase, the Assets is based upon its own independent evaluations of such facts and materials deemed relevant by Purchaser and its agents. Other than the representations and warranties of Seller specifically set forth herein, Purchaser has not relied in entering into this Agreement upon any oral or written information from Seller, in any capacity, or any of his employees, affiliates, agents, consultants, attorneys, advisors or representatives, including, without limitation, any appraisals, projections or evaluations of credit quality prepared by Seller or any of his employees, affiliates, agents, consultants, attorneys, advisors or representatives. Purchaser further acknowledges that no employee, affiliate, agent, consultant, attorneys, advisor or representative of Seller has been authorized to make, and that Purchaser has not relied upon, any statements or representations other than those specifically contained in this Agreement. Without limiting the generality of the foregoing, Purchaser acknowledges and agrees that Purchaser is purchasing the Assets "as is" and "where is" on the Closing Date, free and clear of liens and encumbrances, and Seller is making no representation or warranty, express or implied, and Purchaser has not relied on any representation or warranty, express or implied, regarding the Assets.

## ARTICLE IV.

## CLOSING

4.01 **Closing Date.** The closing of the transaction contemplated by this Agreement (the "**Closing**") shall be held at the offices of Squire, Sanders & Dempsey L.L.P., 30 Rockefeller Center, New York, New York 10112 on the date that is ten (10) days after the date on which the Sale Order shall become a Final Order, or if such date is not a Business Day, on the next Business Day (said date being herein referred to as the "**Scheduled Closing Date**"), TIME

BEING OF THE ESSENCE with respect to Purchaser 's obligation to close on the Scheduled Closing Date. The actual date on which the Closing occurs is herein referred to as the "**Closing Date.**"

    4.02    Notwithstanding anything to the contrary herein, in the event that a stay of the Sale Order is entered and is not lifted within thirty (30) days after the entry of the Sale Order, both the Trustee and DealFlow Media Acquisition, Inc. shall have the right to terminate this Agreement by written notice to the other party. Upon any such termination of this Agreement, Seller shall return the Deposit, exclusive of any interest earned thereon, to Purchaser and neither party shall have any further rights or obligations hereunder other than those which expressly survive the termination of this Agreement.

## ARTICLE V.

## CLOSING DELIVERIES

    5.01    **Documents and Payments to be Delivered at the Closing**. At the Closing:

    (a)  Purchaser shall deliver to Seller the Cash Balance and any other amounts payable by Purchaser to Seller;

    (b)  Seller shall execute, acknowledge and deliver to Purchaser an assignment of the Assets, in the form annexed hereto as Exhibit 1;

    (c)  Seller and Purchaser shall each execute and/or deliver such other instruments or documents which by the terms of this Agreement are to be delivered by such party at Closing or which may be required pursuant to the Sale Order, if applicable.

## ARTICLE VI.

## CONDITIONS TO CLOSING

    6.01    **Conditions to Purchaser's Obligation to Close.** Purchaser's obligation to purchase the Assets is subject to the satisfaction of the following conditions precedent, any or all of which may be waived by Purchaser, all of which waivers shall be expressly and specifically made in writing to be enforceable against Purchaser. Notwithstanding the foregoing, the parties expressly agree that Purchaser shall be deemed to have waived all of the following conditions upon Purchaser's acceptance of the Trustee's assignment of the Assets.

    (a)  This Agreement shall be in full force and effect;

    (b)  Seller shall have complied, in all material respects, with his obligations under Article V hereof;

    (c)  Seller shall have delivered to Purchaser (i) one (1) true and correct copy of the Sale Order, which order shall, among other things, authorize Seller to sell and convey the Assets to Purchaser free and clear of liens, claims and encumbrances and (ii) a

certificate of Seller that no stay of the Closing has been issued with respect to the Sale Order by the Bankruptcy Court which remains in effect as of the Closing Date;

(d) The Sale Order shall be a Final Order.

6.02 **Conditions to Seller's Obligation to Close.** Seller's obligation to sell and convey the Assets is subject to the satisfaction of the following conditions precedent, any or all of which may be waived by Seller, all of which waivers shall be expressly and specifically made in writing to be enforceable against Seller. Notwithstanding the foregoing, the parties expressly agree that Seller shall be deemed to have waived all of the following conditions upon Seller's acceptance of the Cash Balance.

(a) This Agreement shall be in full force and effect and there shall not then exist any event which would allow Seller to terminate this Agreement pursuant to the express terms hereof;

(b) Purchaser shall have complied, in all material respects, with its obligations under Article V hereof;

(c) The Bankruptcy Court shall have issued the Sale Order and such Sale Order shall have become a Final Order and be in effect and not stayed at the time of Closing; and

(d) No order staying or enjoining the Closing shall be in effect.

6.03 **Bankruptcy Court Approval**

(a) Notwithstanding anything to the contrary in this Agreement, all rights of the Purchaser and obligations of the Seller under this Agreement are subject to entry of an appropriate order by the Bankruptcy Court authorizing the Seller and Purchaser to close the transaction contemplated by this Agreement.

(b) As soon as possible after the Effective Date, Seller shall schedule a hearing in the Bankruptcy Court seeking entry of an order (the "**Sale Order**") by the Bankruptcy Court authorizing Seller to consummate the sale transaction contemplated by this Agreement to the Purchaser, and pursuant to Section 363(f) of the Bankruptcy Code, to sell the Assets free and clear of all liens, claims and encumbrances, with such liens, claims and encumbrances, if any, to attach to the proceeds of the sale of the Assets.

## ARTICLE VII.

## REPRESENTATIONS AND WARRANTIES

7.01 **Representations and Warranties by Seller as to Seller.** Seller represents and warrants to Purchaser that, as of the date hereof:

(a) <u>Seller</u>. Seller is the Chapter 7 trustee of Debtor in the Bankruptcy Case and owner of the Assets.

(b) <u>Authority</u>. Subject to the entry of the Sale Order, Seller shall have the authority to enter into and perform this Agreement.

(c) <u>Conflict with Existing Laws or Contracts</u>. Except with respect to the requirements of the Bankruptcy Code, the execution and delivery of this Agreement and all related documents and the performance of his obligations hereunder and thereunder by Seller does not conflict with any provision of any law or regulation to which Seller is subject, conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Seller is a party or by which Seller is bound or any order or decree applicable to Seller or result in the creation or imposition of any lien on any of the assets or property of the Debtor's estate, which would materially and adversely affect the ability of Seller to perform his obligations under this Agreement.

Notwithstanding the foregoing, all of Seller's representations set forth herein shall be deemed to merge with the assignment of the Assets and shall not survive the Closing. Seller makes no other representations, other than the representations as set forth above.

7.02 **Representations and Warranties of Purchaser.** Purchaser represents and warrants to Seller that, as of the date hereof:

(a) <u>Authority; Binding on Purchaser; Enforceability</u>. Purchaser is a corporation with a principal place of business at 88 Froehlich Farm Blvd., Suite 206, Woodbury, New York 11797 and is purchasing the Assets and executing this Agreement in its own name, with requisite powers adequate for the making and performing of this Agreement and for carrying on the business now conducted or proposed to be conducted by it. The Purchaser has taken all action required to execute, deliver and perform this Agreement and to make all of the provisions of this Agreement the valid and enforceable obligations they purport to be.

(b) <u>Conflict with Existing Laws or Contracts</u>. The execution and delivery of this Agreement and all related documents and the performance of its obligations hereunder and thereunder by Purchaser do not conflict with any provision of any law or regulation to which Purchaser is subject, conflict with or result in a breach of or constitute a default under any of the terms, conditions or provisions of any agreement or instrument to which Purchaser is a party or by which Purchaser is bound or any order or decree applicable to Purchaser, or result in the creation or imposition of any lien on any of Purchaser's assets or property, which would materially and adversely affect the ability of Purchaser to perform its obligations under this Agreement; and, except for the Sale Order, Purchaser has obtained all consents, approvals, authorizations or orders of any court or governmental agency or body, if any, required for the execution, delivery and performance by Purchaser of this Agreement.

(c) <u>Legal Action Against Purchaser</u>. There are no judgments, orders or decrees of any kind against Purchaser unpaid or unsatisfied of record or any legal action, suit or other legal or administrative proceeding pending, threatened or reasonably anticipated which could be filed before any court or administrative agency which has, or is likely to have, any

material adverse effect on (i) the business or assets or the condition, financial or otherwise, of Purchaser or (ii) the ability of Purchaser to perform their obligations under this Agreement.

(d) <u>OFAC</u>.  Purchaser represents and warrants that (a) Purchaser, and to Purchaser's actual knowledge, each person or entity owning an interest in Purchaser is (i) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury ("<u>OFAC</u>") and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation, and (ii) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States, and (iii) not an Embargoed Person, (b) to Purchaser's actual knowledge, none of the funds or other assets of Purchaser constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person, and (c) to Purchaser's actual knowledge, no Embargoed Person has any interest of any nature whatsoever in Purchaser (whether directly or indirectly).

(e) <u>Bankruptcy or Debt of Purchaser; Financial Condition</u>.  Purchaser has not filed any petition seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any law relating to bankruptcy or insolvency, nor has any such petition been filed against Purchaser.  No general assignment of Purchaser's property has been made for the benefit of creditors, and no receiver, master, liquidator or trustee has been appointed for Purchaser or any of their property.  Purchaser is not insolvent and the consummation of the transactions contemplated by this Agreement shall not render Purchaser insolvent.  Purchaser has now and will have as of the Closing sufficient capital or net worth to meet their current obligations.

Notwithstanding the foregoing, all of Purchaser's representations set forth herein shall be deemed to merge with the assignment of the Assets and shall not survive the Closing.

## ARTICLE VIII.

## TRANSACTION COSTS

8.01    **Seller's Transaction Costs.**  Seller shall be responsible only for the cost of his legal counsel, advisors and the other professionals employed by him in connection with the sale of the Assets.

8.02    **Purchaser's Transaction Costs.**  Purchaser, in addition to its other payment obligations hereunder, shall be responsible for all costs and expenses associated with (a) Purchaser's due diligence, (b) Purchaser's legal counsel, advisors, engineers, consultants and the other professionals employed by it in connection with Purchaser's due diligence and the purchase of the Assets, and (c) all costs and expenses of obtaining any financing Purchaser may elect to obtain .

# ARTICLE IX.

## AUCTIONEER

9.01 **Representations.** Purchaser and Seller each represents and warrants to the other that such parties have not had any conversations or dealings with any broker, finder or other similar party in connection with the transactions contemplated hereby, other than M.Y.C. & Associates, Inc. (the "**Auctioneer**"). Purchaser shall indemnify, defend and hold Seller harmless from and against any and all claims, liabilities, losses, damages, costs or expenses (including, without limitation, reasonable attorneys' fees and expenses), arising out of a claim of a breach of the representation made by Purchaser pursuant to the first sentence of this Section 13.01. Seller shall pay Auctioneer such commission or fee as may be owed to Auctioneer pursuant to a separate retention of Auctioneer and/or commission or fee application that may be approved by the Bankruptcy Court in the Sale Order (or any other order issued by the Bankruptcy Court), and Purchaser shall not be under any obligation to pay any commission or fees to Auctioneer. The provisions of this Article IX shall survive the Closing or termination of this Agreement.

# ARTICLE X.

## ASSIGNMENT

10.01 **No Assignment by Purchaser.** Neither this Agreement nor any of the rights of Purchaser hereunder (nor the benefits of such rights) may be assigned, transferred or encumbered without Seller's prior written consent and any purported assignment, transfer or encumbrance without Seller's prior written consent shall be void. Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement subject to the following conditions: (a) the assignment must be to a limited partnership, limited liability company or other entity controlled by Purchaser or any owner of Purchaser as of the date hereof and in which Purchaser or such owner of Purchaser as of the date hereof own, directly or indirectly, at least a 51% interest; (b) such assignee must assume all of Purchaser's obligations hereunder in a manner reasonably acceptable to Seller and become jointly and severally liable with Purchaser for all such obligations; (c) such entity shall not be insolvent at the time this Agreement is assigned to it or rendered insolvent by the payment of any compensation for such assignment; and (d) at least five (5) days prior to the proposed assignment, Purchaser shall provide Seller with notice thereof and evidence that the foregoing conditions are satisfied.

# ARTICLE XI.

## DEFAULT AND REMEDIES

11.01 **Purchaser's Default On or Before Closing.** If, on or prior to the Closing Date, (i) Purchaser defaults in any of the material covenants, agreements or obligations to be performed by Purchaser under this Agreement on or as of the Closing Date (or at the Closing), (ii) Seller shall become aware of an inaccuracy in any representation or warranty made by Purchaser pursuant to Section 7.02 hereof (as made as of the date hereof) which has a material adverse effect on Seller, or (iii) Purchaser otherwise materially defaults hereunder and such other material default is not cured by the Closing Date, then, and in any of such events, Seller, as his sole remedy

therefor, may terminate this Agreement by written notice to Purchaser, whereupon, as liquidated damages on account thereof, Purchaser shall be liable to Seller for an amount equal to the Deposit, and Seller may retain the Deposit, together with any interest earned thereon and credit the Deposit against Purchaser liability.  Upon any such termination of this Agreement, neither party shall have any further rights or obligations hereunder other than those which expressly survive the termination of this Agreement.  Seller and Purchaser agree that the damages that Seller will sustain as a result of such termination will be substantial but will be difficult to ascertain, and the aforesaid liquidated damages are a fair and reasonable amount to be retained by Seller as agreed and liquidated damages in light of Seller's removal of the Assets from the market and the damages incurred by Seller and shall not constitute a penalty or a forfeiture.

11.02  **Seller's Default On or Before Closing.**

(a)  If, on or prior to the Closing Date, (i) Seller defaults in any of the material covenants, agreements or obligations to be performed by Seller under this Agreement on or as of the Closing Date (or at the Closing), or (ii) Seller otherwise materially defaults hereunder and such other material default is not cured by the Closing Date, then, and in any of such events, Purchaser, as its sole remedy therefor, may either (1) elect to proceed to the Closing, without abatement, credit against or reduction of the Purchase Price or (2) terminate this Agreement by written notice to Seller, whereupon the Deposit (to the extent that such has been deposited) shall be returned to Purchaser.  If Purchaser shall elect to so terminate this Agreement, then, upon such election, neither party shall have any further rights or obligations hereunder other than those which expressly survive the termination of this Agreement.

(b)  If, on or prior to the Closing Date, Purchaser shall become aware of an inaccuracy in any representation or warranty made by Seller pursuant to Section 7.01 hereof (as made as of the date hereof) which has a material adverse effect on Purchaser, then Purchaser, as its sole remedy therefor, may either (1) elect to proceed to the Closing, without abatement, credit against or reduction of the Purchase Price or (2) terminate this Agreement by written notice to Seller, whereupon the Deposit (to the extent such has been deposited) shall be returned to Purchaser; it being understood and agreed that in no event shall Purchaser be entitled to monetary damages.  If Purchaser shall elect to so terminate this Agreement, then, upon such election, neither party shall have any further rights or obligations hereunder other than those which expressly survive the termination of this Agreement.  Without limiting the generality of this Section 11.02(b), in no event shall the occurrence of the event or circumstance described in the first sentence of this Section 11.02(b) give rise to any obligation of Seller to cure an inaccuracy in any representation or warranty or otherwise make Seller liable for damages on account thereof.

(c)  If Purchaser, with knowledge of (i) a default in any of the covenants, agreements or obligations to be performed by Seller under this Agreement and/or (ii) a material inaccuracy in any representation or warranty of Seller made in this Agreement, elects to proceed to Closing, then, upon the consummation of the Closing, Purchaser shall be deemed to have waived any such default or material inaccuracy and shall have no claim against Seller on account thereof.

11.03  Except as expressly provided in this Article XI, in the event of a default by one of the parties hereto, the non-defaulting party hereby waives any other right or remedy, at law or in equity, which such non-defaulting party may have or be entitled to as a result of any default by the defaulting party.  The term "**Default**", as used herein, shall mean the failure to perform an obligation or covenant.

# ARTICLE XII.

## NOTICES

12.01 **Notices.** All notices, demands, requests and other communications required hereunder (a) shall be in writing, (b) shall be deemed to have been given upon receipt, (c) shall be sent either (i) by registered or certified mail, return receipt requested, (ii) by any national overnight receipted courier service, or (iii) by facsimile transmission, and (d) shall be addressed to the party for whom it is intended at the address hereinafter set forth:

    To Seller:

    Robert L. Geltzer, Esq., as Chapter 7 Trustee of Doubledown Media LLC
    c/o Law Office of Robert L. Geltzer
    1556 Third Avenue, Suite 505
    New York, New York 10128
    Attention: Robert L. Geltzer, Esq.
    Facsimile: (212) 410-0400

    with a copy to:

    Squire, Sanders & Dempsey L.L.P.
    30 Rockefeller Plaza
    New York, New York 10112
    Attention:  Robert A. Wolf, Esq.
    Facsimile:  (212) 872-9815[1]

    To Purchaser:

    DealFlow Media Acquisition, Inc.
    88 Froehlich Farm Blvd., Suite 206
    Woodbury, NY 11797
    Attn: Steven Dresner

or at such other address in the United States of America as may be designated by either of the parties in a written notice given in accordance with the provisions of this Section.  The attorney for any party may send notices on that party's behalf.  Any notice which is rejected, the acceptance of which is refused or which is incapable or being delivered for any reason, shall be deemed received as of the date of attempted delivery.

# ARTICLE XIII.

## MISCELLANEOUS

13.01 **Governing Law; Jurisdiction and Venue.** This Agreement shall be governed by, and construed in accordance with, the Bankruptcy Code, and to the extent that they do not conflict, the substantive laws of the State of New York, without regard to conflict of law principles. Purchaser hereby consents to the exclusive jurisdiction of the Bankruptcy Court in connection with any matter arising under this Agreement.

13.02 **Further Assurances.** In addition to the obligations required to be performed hereunder by Seller and Purchaser at or prior to the Closing, each party, from and after the Closing, shall execute, acknowledge and/or deliver such other instruments, as may reasonably be requested in order to effectuate the purposes of this Agreement.

13.03 **Successors.** All of the provisions of this Agreement and of any of the documents and instruments executed in connection herewith shall apply to and be binding upon, and inure to the benefit of Seller and Purchaser, their successors and permitted assigns, subject in the case of Seller, to Bankruptcy Court approval.

13.04 **No Third Party Beneficiary.** This Agreement and each of the provisions hereof are solely for the benefit of Purchaser and Seller and their permitted assigns. No provisions of this Agreement, or of any of the documents and instruments executed in connection herewith, shall be construed as creating in any person or entity other than Purchaser and Seller and their permitted assigns any rights of any nature whatsoever.

13.05 **Entire Agreement.** This Agreement, together with the documents and instruments executed and delivered in connection herewith, sets forth the entire agreement between Purchaser and Seller relating to the transactions contemplated hereby and all other prior or contemporaneous agreements, understandings, representations or statements, oral or written, relating directly to the Assets are superseded hereby.

13.06 **Severability.** If any provision in this Agreement is found by the Bankruptcy Court or a court of competent jurisdiction to be in violation of any applicable law, and if such court should declare such provision of this Agreement to be unlawful, void, illegal or unenforceable in any respect, the remainder of this Agreement shall be construed as if such unlawful, void, illegal or unenforceable provision were not contained herein, and the rights, obligations and interests of the parties hereto under the remainder of this Agreement shall continue in full force and effect undisturbed and unmodified in any way.

13.07 **Modification.** This Agreement and the terms hereof may not be changed, waived, modified, supplemented, canceled, discharged or terminated orally, but only by an instrument or instruments in writing executed and delivered by Purchaser and Seller.

13.08 **Waiver of Trial by Jury.** EACH PARTY HEREBY WAIVES, IRREVOCABLY AND UNCONDITIONALLY, TRIAL BY JURY IN ANY ACTION BROUGHT ON, UNDER OR BY VIRTUE OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED IN CONNECTION HEREWITH, THE ASSETS, OR ANY CLAIMS, DEFENSES, RIGHTS OF SET-OFF OR OTHER ACTIONS PERTAINING HERETO OR TO ANY OF THE FOREGOING.

13.09 **No Recording.** Neither this Agreement nor any memorandum hereof shall be recorded. Each party hereby agrees to indemnify and hold harmless the others for all liabilities, losses, damages, liens, suits, claims, costs and expenses (including reasonable attorneys' fees) incurred by the other by reason of a breach of the foregoing covenant.

13.10 **Captions; Interpretation.**

(a) The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof. All references to "Articles" and "Sections" without reference to a document other than this Agreement, are intended to designate articles and sections of this Agreement, and the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article or Section, unless specifically designated otherwise.

(b) As used in this Agreement, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

(c) The use of the term "including" shall mean in all cases "including but not limited to" unless specifically designated otherwise.

(d) No rules of construction against the drafter of this Agreement shall apply in any interpretation or enforcement of this Agreement, any documents or certificates executed pursuant hereto, or any provisions of any of the foregoing.

13.11 **Counterparts.** This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same original, and the execution of separate counterparts by Purchaser and Seller shall bind Purchaser and Seller as if they had each executed the same counterpart.

13.12 **No Waiver.** Neither the failure of either party to exercise any power given such party hereunder or to insist upon strict compliance by the other party with his/its obligations hereunder, nor any custom or practice of the parties at variance with the terms hereof shall constitute a waiver of either party's right to demand exact compliance with the terms hereof.

13.13 **Time of Essence.** Time shall be of the essence with respect to this Agreement and the covenants and obligations of the Purchaser hereunder.

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**SELLER:**

/s/ Robert L. Geltzer
Robert L. Geltzer, as Chapter 7
Trustee of Doubledown Media LLC, and not personally

**PURCHASER:**

/s/ Steven Dresner
Steven Dresner, President, DealFlow Media Acquisition, Inc.